Thank you, Your Honors. My name is Dominic Cappecci. I'm with the Law Offices of Kisner and Cappecci. I'm representing the petitioner in this matter. Like the previous matter that appeared before this Court moments ago, I believe that the most important question in this case is whether or not the petitioners, the husband and wife, did knowingly and voluntarily waive their right to contest their removal. I do not believe that it's similar factually as the previous matter because in this matter there was no form, whether it be an I-791, which existed in 1990 when they entered the United States, nor a form I-94, which is now required to be signed in order to voluntarily and It appears that what occurred, according to the statement of both respondents, as well as to a submission at Exhibit 3A, is that no one, including an officer nor the agent that brought them, advised them of such waiver of rights, and also there is no form to indicate that that occurred either in the record. So I don't believe that 8 CFR Section 217.2b was upheld, and at the time in 1990 that wasn't the same regulation. It was actually found in 8 CFR Section 217.2b. So you're saying there's no signed waivers? Correct. And that was actually augmented by Respondents' Council on August 11, 2009, wherein there are orders of removal of 2008 filed by the If I can find it, Your Honor. Incorrectly states that when you signed a form I-94w, you waived your right to contest deportability. But in this record that did not – that is impossible because in 1990 there was no I-94w, as Respondents' Council correctly noted in her response brief, the answering brief, because attached there too were the regulations that were in existence at that time, which was 8 CFR Section 217.2, excuse me, Your Honor, A-5, which would have required an I-791. But in the submission and in the record itself also there is no I-791 signed. So unlike BIO of the Seventh Circuit, Bradley of the Third Circuit, HANDA, which really doesn't apply, but in all those cases there is a signed waiver. In this case, factually, that's not the case. All right. Counsel, Judge Gould with a question about that. Yes, Your Honor. It's actually two related questions. First of all, isn't there normally a presumption of administrative regularity, that is, you assume that the – that an administrative agency follows the law, and if their program requires a waiver for entry absent a visa, that they would require it? Now, second related, if there is no signed waiver, how did the petitioners – you know, how did they get the country? Okay. I think both those questions – I can answer both those simultaneously almost. First of all, with reference to – let me think about that for one moment, Your Honor. Basically, could the Court rephrase the first question? I apologize, because I – I haven't looked at my administrative law treatises for a while. Right. But I thought that the Supreme Court and the circuit had recognized the principle that there's a presumption of administrative regularity. Right. Okay. If you assume that if there's a legal program, that the people administering it follow it. Yes, Your Honor. Some other evidence. I apologize. Now I recall the first question of the Court. The answer is yes, there is a presumption of that. And the bio actually refers to that, and Bradley refers to that as well. And in bio, they wanted an actual knowing involuntary waiver. In Bradley, there was just a presumption of the same. So in Bradley, we looked at the record to see whether or not that presumption would be overcome. And in that case, there was a signed form I-94 and a statement that says, although it was hazy – Yes, Your Honor. If I understood his question, isn't there a presumption that if there's a rule that said if you want to come into the United States without a tourist visa, for example, you have to sign a waiver, isn't there a presumption that the agency would have complied with the legal requirements and have insisted on his signing a waiver? Indeed, Your Honor. Am I accurate? Right. That's correct. Yeah. And then my related second question was, if they didn't do that, how did they get in the country? Okay. Thank you, Your Honor. Your Honors, that is correct. There is a presumption. But two things. One, this record overcomes that presumption because in the record, the officer is stating that something was signed at an I-94W which didn't exist at the time. The individuals say that no one advised them of the waiver. There is no signature. So in this record, even if there was a presumption held that officers do So did they have a visa? No. It's a visa waiver. So there is no technical visa. Okay. So then if they came in under the visa waiver program, why doesn't the presumption apply? It does apply. I'm saying the record overcomes the presumption. So they didn't sign anything, you're saying. Correct. So they're illegally in the country. Well, no, they're not. Because according to, for example, Quinlinton, it often occurs that procedural safeguards are followed and that satisfies the presumption that officers are doing their job but they accidentally let someone in the country. In that case, somebody entered illegally at the U.S.-Mexican border. The officer asked the driver, who's that? The person said, oh, that's a U.S. citizen. And the officer motioned and that person came in. Now, that board case held that those procedural safeguards were upheld. Nonetheless, that person should not have been admitted as a visitor. So there is a presumption that the officers do their job. I'm sure the officers in this case did their job. But they didn't do it well enough because in this record, that presumption is overcome by the lack of the signature. And your clients say they didn't sign anything? Correct, Your Honor. And there's the officer actually. Now, they've actually said this in some sworn statement, that they didn't sign anything? I thought they just didn't understand what they signed. They didn't say that they signed or didn't sign anything. They just said that no one told them about the waiver of rights. But the documentary. Well, they must know whether they signed something. True. Well, in 1990, I'm not sure that they would have remembered 16 years ago whether or not they signed something. But there's nothing in the record that indicates they did remember signing anything. They said they weren't told about the requirements. And the record, the evidence, doesn't reveal anything. So they just thought they could stay forever? What's in the record about that? So they've put in the record that we didn't sign anything, we just thought we could stay forever, even though we had no basis to come in? Is that in the record? No. I think what's in the record is that they wanted to come to be with their relatives, and they got on a plane and they came to the border and they were admitted. I don't think that they know at all the procedural requirements because they weren't followed because ACFR Section 217.285 was not followed. And all we're saying is if the regulations are followed correctly, they have a choice to admit the truth and either go home and not sign it or sign it, and then no, you have 90 days to stay here, and that's all you have unless you file for asylum, which they did, incidentally, two months after they arrived here. I don't know if that answers the question. I just want to be clear. Go ahead, Judge Goulden. I think I've got your answer to my second question, which was if they didn't sign the visa waiver, program waiver, how did they get in? And I turned your answer, well, they just came here and the officials let them in. Is that what you're saying? That's what I'm saying. I'm saying they arrived at the border. The officer probably saw they were being transferred. Well, all right, but you're not saying that. No one said that under penalty of perjury. You're just saying that now that that's plausible. Did someone say that under penalty of perjury? Say what under the penalty of perjury? What you're saying now, are you just making that's how they could have gotten here? No, no, I'm saying that's what the record looks like. All the evidence in the record appears to me, based on what they've said, based on the documents produced and the record of proceedings. Did they ever say that under penalty of perjury, what you're proffering as how they got here? They said that they wanted to come and visit their relatives and that they were French citizens and they were told by some people in France that they could come and visit. That's in the record. And they were just let in. Right. What I think happened here is the officer did not follow the regulation at the point of entry. The person is supposed to bring an I-94 and at the time an I-791 simultaneously to the officer. Those forms have all the rights that is waived. The individual is with an officer, signs the waiver, and comes in the country. That didn't occur in this case. And I just want to understand your – I don't think I quite understand your argument that the record shows, sort of overcomes the presumption that they would have been asked to sign it. Is it because of a misdescription by someone of the form that they were asked to sign? Because it said I-95W and is it the W after the I-9 – whatever the form is. I've got I-97. I-791 and the I-94. Right. What is the – I didn't understand your response as to why the presumption that they would have been asked to sign the waiver has been overcome here. Okay. Could you go through it? Yes, I can. Thank you, Your Honor. The government is claiming that – well, first of all, if all the regulations were respected properly, and therefore in the submission we have here, Officer Otto says you've waived your rights under 217 of the Immigration and Nationality Act and you signed an I-94W, therefore the power that I have orders you removed. So you have an order of removal. If that's true, then the evidence that the government rests upon has to exist there, and it doesn't exist there. Because there's no such thing as an I-94W, is that it? No, because at the time there should have – what the officers should have produced was an I-94, which was produced. It's in the record. The I-94 is in the record. There's no signature. There's no waiver of rights on it. It's in French. I had it read to me in English. There's no waiver of rights on it. That's in the record. And there's no signature in the record. So if the I-94 is in the record and the passports are in the record, why wouldn't the I-791 be there also? Why wouldn't the government have produced those documents, all of them, including the signature, to justify its order, which has a 10-year bar attached to it, just like an immigration judge's order? What's missing that you say should be there? The I-94 on I-791 should accompany the I-94, which is in the record. If the officer saw the I-94, which the officer did because there's a WT on it, then that form should be there, too, signed. Even if the form were there, you'd still be claiming that it wasn't knowing involuntary because your clients don't know anything about it, right? No. I wouldn't say that. Because if that were the case, they would be at the border and they would have a statement saying what happened. And if what happened was they saw an officer and they signed certain things and certain things occurred and the officer interacted with them and said, you know, this is the consequence, which is the presumption that Honorable Judge Gould was saying, what should happen, then that would be there. But that isn't there. And so I just think their statements would reflect what happened. Do you want to reserve any time for rebuttal? Yes, I'll reserve the remaining time, Your Honor. Thank you. Thank you. Good morning. Good morning. May it please the Court, my name is Monica Anton on behalf of the Attorney General. Until today, this signed waiver was not at issue. In their pleadings before the immigration judge, the Hughes admitted that they entered through the Visa Waiver Pilot Program. And it's true that the DHS officer, when he entered the removal order, referenced the wrong form, the form I-94W, rather than the I-791 that was in place at the time that the Hughes entered. But they don't dispute entering through the Visa Waiver Program. And as you indicated, the presumption of regularity of agency action would tell us that they did, in fact, enter through the Visa Waiver Program. So could the government have moved any slower in this? Unfortunately, the samples... You know, I mean, you know, I realize that you have a lot to do. But these people, you know, you've let them make a life here. I understand. And, you know, and in terms of sympathetic, you know, I mean, I guess, you know, I mean, we have to deal with legal issues. But in terms of the sympathetic factor, they certainly have that, as opposed to a lot of other cases. I do agree with you on that. And I have no satisfactory answer as to why... Well, had you ever thought about mediating it? Well, they don't have an immediate option available to immigrate, but they will soon. So at that point... What will they have soon? Their oldest child will be 21 next year. And then what happens? The child can file an immediate visa relative petition. They'd have to seek consent to reply for admission into the U.S., and then they would be able to immigrate. Even if they were removed right now? Well, they'd have to... So the order of removal would cause a bar to admissibility, which could be a bar to apply for readmission to the U.S., but they can seek consent to overcome that bar. So they would have to leave the U.S. and process through the consulate. They would not be able to adjust status under Momeni v. Chernoff, but they will have an opportunity to immigrate to the U.S. So it's kind of like, how long did it take you to do this in the first place, and now we've almost, you know, it's... I always say I'm waiting for the citizen grandchild, or, you know, it's... I do understand, and unfortunately, I'm sorry, I have no answer. Just the asylum office had so many applications that they... In San Francisco, they had so many asylum applications that they just had these very long delays. If my memory serves me correctly, one of the things they asked for was voluntary deportation? Correct. Voluntary departure? Departure. I'm sorry, voluntary departure. What benefit would that give them? Well, it would permit them to leave without any order of removal and not have that bar of inadmissibility, but I will point out that until DHS entered that removal order, they could have left the country without facing any bars of inadmissibility, so they could have... Why won't you... Now, I mean, considering all that has happened in this case, why won't you consent to a voluntary removal? Why won't the attorney general consent to it? That is outside the scope of the visa waiver statute, unfortunately, so they cannot seek voluntary departure or cancellation of removal, only asylum, which they have done. And they don't qualify because they relocated to... They were found to have resettled in France or something? Right. So where are they going to go? They're going to France? France, correct. They were granted withholding to Laos, which is where they sought asylum from, but since they're French citizens, they're firmly resettled. Judge Gould, were you going to ask a question? Here's my question. It may be an off-the-wall question, but I'll ask it anyway. As I understand it, they don't have a right to apply for voluntary departure entering under the visa waiver program, but is there anything in the immigration laws that would stop the government from sua sponte, letting them depart voluntarily? ICE does have a program, I guess, called deferred action, where they will not act on an order of removal. I'm not sure if they would be able to permit voluntary departure. I think that's just outside of the scope of their authority under the statute, although I don't know what deferred action would do either because they'd still have to leave the U.S. to process through the consulate. It's not clear to me whether they'd have to necessarily go back to France or whether it could be through any consulate, maybe Canada or somewhere easier to travel, but I don't, I can't think of any way that DHS would have the authority to, I guess they would have to vacate the removal order. Well, DHS seems to be able to do whatever it wants to do when it wants to do it. I mean, we're the ones that we can't do what we want to do. We have to follow the law. Well, DHS does also. Well, why is the Attorney General the party here rather than DHS? I'm just trying to understand this. It is technically both, the Attorney General and DHS, because the asylum-only proceedings came up through the Executive Office for Immigration Review and the removal orders were entered by DHS. If we, if sometimes we enter orders that let the parties opt in to mediation and they don't have to tell us if they want to do it or not, would the order just ask them to tell the circuit mediator? And if any of the parties decide they don't want to do it, then it comes back to us. But I guess before thinking about whether we could do such an order, I wondered if you could tell me, does the government have any options? In terms of what exactly? In terms of can it legally cancel the removal order that was entered and give them a voluntary departure. You don't know if the statute permits that? I just, I don't think it does because of the waiver language of the Visa Waiver Program. So I think DHS does have some options in terms of deciding whether to pursue removal or not. But, and the order of removal would not be necessarily a bar to immigrate. There is a way to get around. Well, that would probably take another 10 years anyway. Hopefully not at this point. I do apologize for the delay and I'm sorry that I have no answers to give. It's not really, it's not something. It's not personally your fault. I understand. If you're telling me that you're going to send the case to mediation, then I suppose we could work it out and I'll see what I can do with DHS. I don't understand what the President himself said. Let them go voluntarily. That would violate the law? That would be something that DHS would say, you know, I'm resigning to whoever, Ms. Napolitano is going to resign because she's not going to obey the order? I don't understand that. I mean, I understand under the statute it doesn't provide for voluntary removal, but I don't understand the concept that the executive branch can't simply say, we're going to let them leave voluntarily. I think for that to happen, DHS would have to vacate the removal order. Well, it's just that we read things in the newspaper like that DHS is just going to decide to go against only the violent felons and that they're not going to do, you know, that they're not going to go against the people that are, you know, are paying their taxes, even though they're illegally here, even though they've been, you know, all of those. So there is a sense for people that DHS does have some ability. The only options that I'm aware of is deferred action. I did not ask them about voluntary departure, and they have been involved in this case, and nobody raised the possibility of permitting voluntary departure. From DHS's perspective, they have an interest. They're all bureaucrats. They probably don't care that these people have been here for 12 years and now went 14 years. I mean, it's just, you know, do you ever hear the expression, rule books slow down? Well, they've been here 20 years, haven't they? 20 years. Yeah. Since 1990. From DHS's perspective, it's a matter of the greater visa waiver program, and I understand that this family is an anomaly in terms of that. They could adjust to anomalies. There's an expression in labor law called the rule book slow down. It means that if all of the people who work for the government followed the rules to the letter, the whole system would shut down. In other words, you have to use a degree of judgment. He's a former U.S. attorney. You have to use a degree of judgment and common sense in applying these rules to an unusual case, and it doesn't set a precedent if the case is sufficiently unusual. Well, I think the bigger issue here that if you sat and listened to the other case as well is that, you know, parties are asking the court to create a whole due process system with the visa waiver program, which I think if the government wants to get excited, that would be something that is, if you have nothing else to do, that there would be a whole set of constitutional rights that somehow would be, that would, you know, would jump out of the fact that they didn't say no. You know, as I said, under the no good deed goes unpunished, you could just say no and not let someone in, but then once you let them in, then automatically it's tag, you're it. And as far as the... And I'm obviously concerned about that. Right. And as far as that goes, the government does disagree with the Fifth and Seventh Circuit's analysis as to whether due process rights attach to the waiver, but we would not be opposed to the court bypassing that issue and going to prejudice because as was discussed in the prior case, no one would be able to demonstrate prejudice. So the prejudice here in terms of the analysis other than we've just, you know, gone through, you know, pulling on your heart strings and everyone else's, but that aside, if you make a prejudice analysis under the law, what, you know, what is your argument on prejudice? So we're looking at the point when someone enters the U.S. and has that waiver. So the prejudice analysis is that either that person is informed of what the waiver says, chooses to sign it, and is then subsequently held to its terms, or knowing what the waiver says, refuses to sign it because he does not want to be held to its terms and is summarily removed at the border as an unsuccessful applicant for admission through the Visa Waiver Program. So either the person's never going to get into the U.S. because they didn't sign the form, or if they get into the U.S., they'll have to leave within 90 days. Could you tell me again so I understand that if, hypothetically, if we didn't decide the case for a year, what would happen? The oldest U.S. citizen child would file a petition for the parents, who are the only two petitioners in this case. When that visa petition is approved, the parents would be able to immigrate, and they would also have to seek consent to reapply for admission if that removal order stands. But if we waited a year, they would still have to be subject to removal, even though they can take advantage of this? Well, right now they have this day of removal from the court, so they do have that. Short decision in the case. Right, right. So what if we waited a year to decide the case, what would happen? They'd have this day of removal, so DHS would not be able to remove them. I know, but I guess what I'm asking is, so then they could apply for an adjustment of status? Well, it's the equivalent process from outside of the country, consular processing. They wouldn't be able to adjust as visa waiver overstays. So they'd still have to leave? They'd still have to leave, technically, yes. Okay, just as a factual matter, is it correct that the petitioners have been in this country longer than the DHS? Well, yes, it's true that DHS was created in 2003, and the petitioners have been here since 1990. I am very well aware of that. Okay, well. Pardon me? I couldn't resist. It probably doesn't have significance, but I couldn't resist asking that just to point out that, you know, there are some potential consequences in the resolution of the long delays, and there's not much you can do about that, but we have to think about it. Well, I think there's also winning the battle and losing the war sometimes from the standpoint of that. If I'm to understand, there are still quite a few people on this visa waiver program, and I think as was brought out in the discussion with counsel in the last case, that if we were to take the government's position and not find a due process, you know, if we published and said there is not a due process, right, didn't even get into the prejudice analysis, and, you know, accept what the government's position is, then we create a split in the circuit. Then if the Supreme Court, if that's something that would indicate, then they're going to decide, you know, which way they're going to go, whether they're going to go with the seventh and the fifth or they're going to go with the ninth if the ninth went differently. Or if we go with the seventh and the fifth, then we're not adopting that reasoning. We're not creating a split, but we're also creating, you know, some due process, right, and then going to the prejudice angle, yeah, it may dispose of that case, but it still goes in a direction that the government thinks is the wrong interpretation of what rights people have. Let me interject a technical question. Under precedents like Ventura, can we decide in this case an issue of prejudice when the BIA, I think, did not address that issue because they didn't get to the point of assuming a constitutional violation? I believe that the Court, if the Court does pass on prejudice, it would not violate Ventura because this is the type of substantive constitutional claim that the Board doesn't have the authority to address. Okay. Thank you. All right. That concludes your time unless any panelists have additional questions. If I were the Solicitor General deciding that which was the best case to have the issue, the principle issue, not the prejudice issue, brought to the Supreme Court, I would say I don't want the Ninth Circuit to decide that issue. I'd rather lose the case than win this case on this ground, create a conflict in the circuits, which would then bring this whole issue before the Supreme Court because this would be the worst possible set of facts. So could you go back to the Department of Justice and ask whether they really want to press this in this case, whether this is the case that they want to create a conflict, or they just want to, in a sense, confess error and let it go? I will certainly take your concerns back, and I agree that this probably is not the best case to have the issue. I think the Solicitor General would, too. And he often acquiesces, or she, whoever it may be at the time, often acquiesces in losses and doesn't press issues because they think it's not a really good fact pattern that they want to have litigated. I mean, does the Solicitor General know what you're doing here? No, because you've won below and he's not had any role in determining what position the government should be taking in this case. Well, thank you for your argument in this matter, and we recognize that you aren't in a position to bind your superiors at this point, but we appreciate that you have taken the opportunity to discuss with the Court what some of the options, you know, how the process works more in a nuts-and-bolts sense because, obviously, we're going to make a legal determination, and that's the way we decide things, but we also, it's helpful to understand what, you know, how these things actually work. Thank you. Thank you. Okay. Does count? Oh, I'm sorry, we're not done. Go ahead. Did you have, do any of the panelists have any additional questions for? I just have one. I just want to know, is your, does your appeal come down now to the issue that they didn't sign the piece of paper? Is that what this case is? Is that what this appeal is right now? I mean, we have to decide, we don't have to decide any of these other issues that your whole argument here now turns on that they didn't sign the piece of paper? It turns on the fact that ATFR section 217.285 at the time, which is now ATFR section 217. Excuse me, Your Honor. 217.2b was not respected by the government official, and therefore, that waiver didn't occur. There was no signature. The answer to my question is yes. Yes. That's what your whole appeal turns on now. We don't have to reach any issue about the knowing and voluntary waiver because they didn't sign anything. That's what your appeal turns on now? Right. It's not knowing or voluntary. So that is the issue, but that's the facts. No, no, but I'm asking you a question. Is your whole argument here now that they never signed anything? No, no. My argument is that the record indicates that they didn't knowingly and voluntarily waive their rights, but that's a fact. Because what? Because there's no evidence to support the district director's order. Even when they filed the I-589, they checked a visitor. They didn't check a visa waiver tourist. Their statement says that no one told them of that at the border or elsewhere. The record as a whole indicates they came to the border, the officers saw a French passport, stamped visa waiver, which would be the normal process, and they came in. There's no I-791 available. If it was, along with I-94, it would be in the record. Well, in fairness to both sides, I think that the comment would be that your case is not without its legal vulnerabilities either. Certainly, Your Honor. Of course. I think that the Court has expressed questions of both sides. And I think you're in overtime. Unless there's additional questions by counsel, I'm going to ---- I think there's one very important point I have to make. Well, the question is do we have any more questions because we're up. It's about prejudice, Your Honor, because they cannot come back for ten years for multiple reasons, even with voluntary departure or an order of district director order of removal. And the prejudice occurred when they didn't have a chance to make that choice in 1990. Why can't they come back for ten years?  Thank you, Your Honor. They can't apply for an I-212 to overcome the order of removal because the case law says that you have to wait ten years to even file the form. After an order of removal. Correct. And that's after any kind of order of removal. So they're out ten years, even a year from now when the U.S. citizen daughter turns 21. Furthermore, voluntary departure applies. They have a ten-year bar for being here with unlawful presence. They have no qualifying relatives to overcome that with an I-601 waiver. So there's two waivers that they would need, neither of which can they obtain. So if they are removed, and they can't get voluntary departure because under the regulations that's not permissible anyway, but even if we could do mediation and that was the case, there's two bars to returning for ten years that cannot be overcome factually in this case. So you're saying you have to win legally? I'm saying I wish I could see a way mediation could help me in this matter, but in terms of the law, I don't see how that's going to help us. And they can't set aside the removal order? Well, even if they were to set aside the removal order and somehow they were to leave on their own accord, or if they were to take voluntary departure, they have the ten-year bar for unlawful presence at a minimum with no qualifying relatives. And they can't adjust status because Freeman and Mimoyne says that you have to apply for adjustment within 90 days. So when they made that decision at that time, and they were unaware of the consequences, that's when all these prejudices occurred. Actually, because of the citizens' children and living here for 20 years and two of which have disabilities, and that's the hard part. All right. I think you've... But legally speaking as well, Your Honor. All right. Thank you both for your argument. This matter will stand submitted. Thank you, Your Honor. Would this be a good time for a break, Judge Gold? I think so. All right. The Court's going to take a ten-minute recess, and then we'll resume with the two final cases on for oral argument. Thank you.
judges: Korman, Gould, Callahan